**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**LINDA C. DURBIN,**

     **Plaintiff,**

                                **Civil Action 2:17-cv-896**
     **v.**                             **JUDGE SARAH D. MORRISON**
                                **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

**OPINION AND ORDER**

Plaintiff, Linda C. Durbin, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits. Pending before the Court is Plaintiff's Statement of Errors (ECF No. 8), the Commissioner's Memorandum in Opposition (ECF No. 11), Plaintiff's Reply (ECF No. 12), and the administrative record (ECF No. 7). For the reasons that follow, the Court **REVERSES** the Commissioner's decision and **REMANDS** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Opinion and Order.

**I.**     **BACKGROUND**

Plaintiff protectively filed her application for benefits in June 2010, alleging that she has been disabled since January 15, 2010, due to loss of hearing in her left ear, possible epilepsy, poor balance, possible heart condition, major memory loss - short and long term, dizzy spells,

seizure activity, and loss of focus /ability to stay on task. (R. at 107–08, 121.) Plaintiff's application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 9–10.) After presiding over a hearing on April 17, 2012, Administrative Law Judge Timothy G. Keller ("ALJ Keller") issued a decision on May 11, 2012, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 11–31, 32–57.) AJL Keller's determination became the final decision of the Commissioner when the Appeals Council denied review on July 24, 2013. (R. at 1–6.)  Plaintiff thereafter timely commenced a civil action docketed in this Court. (*Durbin v. Commissioner of Social Security*, Case Number: 2:13-cv-00910 (ECF Nos. 1 and 3)). This Court remanded Plaintiff's claim to the Appeals Counsel. (*Id.*, ECF No. 14 and 16, R. at 558–77.) On July 25, 2014, the Appeals Council vacated and remanded ALJ Keller's decision. (R. at 627–29.) ALJ Keller presided over a second administrative hearing on December 2, 2014. (R. at 638.) On December 17, 2014, ALJ Keller issued a second decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 635–57.) On November 27, 2015, the Appeals Council vacated the hearing decision and remanded to a new ALJ. (R. at 658–62.) Administrative Law Judge Jeffrey Hartranft ("ALJ") presided over a third hearing on August 9, 2016, and issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act on September 21, 2016. (R. at 458–94.) On August 18, 2017, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 444–50.) Plaintiff timely commenced this action.

2

## II.    RELEVANT RECORD EVIDENCE[1]

### A.    Relevant Medical History and Records

#### 1.    Plaintiff's Auditory and Vestibular Issues

On January 15, 2010, Plaintiff sought treatment from her primary care physician, Caryn Theobald, M.D., because she experienced sudden hearing loss, earache, headache, pressure and fullness in her ears, tinnitus, and mild dizziness. (R. at 364.) An audiogram confirmed that Plaintiff had acute hearing loss in the left ear. (R. at 365, 322.) A CT scan of Plaintiff's head showed no acute brain abnormality but did show evidence of chronic sinusitis. (R. at 365, 186.) Dr. Theobald instructed Plaintiff not to drive or operate machinery and referred her to an E.N.T. (R. at 365.)

Plaintiff treated with providers at Toledo E.N.T., including neurotologist, Aaron G. Benson, M.D., from January 19, 2010 until March 17, 2010. (R. at 307–08, 310.) During this period, testing was conducted including audiograms on January 19, 2010, and January 29, 2010, which confirmed that Plaintiff had profound hearing loss in her left ear; an MRI of Plaintiff's brain and internal auditory canal on January 22, 2010, which revealed normal, unremarkable results, with no lesions or masses; and an ENG on February 3, 2010, which revealed no abnormalities. (R. at 320–21, 302–03, 316, 309.) Plaintiff was prescribed Prednisone and she received steroid injections in her left ear at several office visits. (R. at 307–08, 311–12, 313, 305, 314.) Dr. Benson's clinical impression was "left sudden sensorineural hearing loss, active

---

[1] Because the ALJ did not review medical records related to Plaintiff's conditions and treatment after the date last insured, March 31, 2013, the Court has not summarized those

3

smoking, tinnitus, vertigo, and dizziness." (R. at 312, 309, 306, 310.) He wrote that instructed

Plaintiff to cease smoking on more than one occasion, but she continued to smoke. (R. at 309,

305.) Dr. Benson also referred Plaintiff to physical therapy for her balance problems. (R. at 309.)

        Notes from Plaintiff's physical therapy sessions indicated that Plaintiff's prognosis was

good, and that she reported doing better. (R. at 362–63, 359, 310.) Plaintiff also reported,

however, loss of vision when her neck was extended. (R. at 304, 310.) Because that was

inconsistent with an otologic problem, an MRI of Plaintiff's head was ordered to investigate the

possibility of a vertebrobasilar insufficiency. (R. at 306, 310.) The results of that test, done on

March 11, 2010, were normal. (R. at 306, 315.) To investigate further, a rotary chair and

posturography were also done, but the results of both of those procedures showed essentially no

abnormalities although Plaintiff did have low gain on her rotary chair and a slight phase lead

with no asymmetry noted. (R. at 310.) An audiogram on March 17, 2010, indicated that

Plaintiff's hearing in her right ear was within normal limits; that she had sensorineural hearing

loss in her left ear; and that compared to prior testing, Plaintiff's hearing in her left ear had

improved "significantly (50%+)."  (R. at 317–19.) Dr. Benson wrote that Plaintiff was "doing

quite well" from an otologic standpoint but he noted that she continued to smoke. (R. at 310.) He

also noted that Plaintiff continued to complain about instability despite a normal ENG. (*Id*.) He

referred her to neurologist, Mark Loomis, M.D. at Toledo Neurological Association, because her

complaints about occasional vision loss were unrelated to her original problem. (*Id*.) Plaintiff

was supposed to continue with physical therapy. (R. at 358.) Records indicate that Plaintiff

records. (R. at 465.)

stopped attending sessions when her insurance stopped covering them in April of 2010, but that

she did not believe that they had helped. (R. at 354.)

Plaintiff's primary care physician also referred her to otolaryngologist Robert H. Mathog,

M.D. on March 25, 2010. (R. at 189.) His physical examination revealed normal findings. (*Id*.)

He opined that an insult to her left ear had impacted her vestibular and cochlear portions; that

vestibular exercises were important; and that there was a good chance that there would be

compensation and that her balance would return in time. (*Id*.) He did not recommend anti-

vertiginous drugs. (*Id*.)

2.      Plaintiff's Neurological Treatment and Cardiological Testing

Plaintiff began treating with neurologist Dr. Loomis on March 31, 2010. (R. at 204–07,

190–91, 259–60.) His physical examination of Plaintiff revealed normal results except for

hearing loss in the left ear, slight vibratory loss in both ankles, and subjective numbness to

pinprick on her left external ear or pinna. (R. at 204–07.) Dr. Loomis opined that Plaintiff

appeared to have had a stroke or a vascular event of the left vestibular artery or left cochlea.

(*Id*.)  Dr. Loomis told Plaintiff that she needed to control her cholesterol and to "stop smoking

forever." (*Id*.) He indicated that he would order additional testing. (*Id*.) An April 5, 2010,

electroencephalogram ordered by Dr. Loomis was normal for a mostly awake adult.  (R. at 221–

22, 261–62, 391–92.)

On May 14, 2010, Plaintiff told Dr. Loomis that she still had trouble climbing steps

because of her dizziness and poor balance and that she sometimes lost her balance when bending

forward. (R. 212–18.) Plaintiff also reported that about two weeks prior to that appointment she

had drank alcohol as usual through Saturday but after she stopped drinking on Sunday, she had a seizure while sleeping in the back of her husband's truck. (*Id.*) She had no incontinence or injury, did not visit a doctor, and she did not learn about the event until she woke up and her husband told her about it. (*Id.*) Dr. Loomis wrote that he could not determine if the event was an alcohol withdrawal seizure or not but noted that Plaintiff reported drinking one to six beers daily for several years. (*Id.*) He advised Plaintiff to gradually taper off drinking alcohol and eventually stop altogether. (*Id.*) He wrote again: "You must stop smoking forever!" (*Id.*) He also instructed Plaintiff to refrain from driving from three months. (*Id.*) Although Dr. Loomis' physical examination of Plaintiff revealed generally normal results, with regard to her gait and station, her wide-based and tandem walking was unsteady "but she did do it." (*Id.*) Dr. Loomis ordered a sleep deprived EEG. (*Id.*) The results of that test, done on May 18, 2010, were within normal limits for an awake, drowsy, and sleepy patient. (R. at 219–20, 265–66, 269–70.)

Dr. Loomis also referred Plaintiff to a cardiologist to rule out a cardiac cause for the nighttime seizure incident. Notes from Thomas M. Pappas, M.D. and Mark Richards, PhD, at Northwest Ohio Cardiology Consultants indicated normal findings for Plaintiff on a stress test and an echocardiogram but that her EKG showed an RSR prime/wimpy right bundle-branch block pattern with ST elevation at V1 and V2. (R. at 252, 273–75, 327–28.) Dr. Richards wrote that Plaintiff's physical examination was normal and that she had appropriate mood, memory, and judgment. (R. at 273–75.) He also wrote that Brugada syndrome was a concern and he recommended an electrophysiology study. (*Id.*) That study was done on July 8, 2010. (R. at 334–

40, 374–75.)  It revealed a very low likelihood of Brugada syndrome. (R. at 341–44, 374–75.) An EKG done on November 4, 2010, was also normal. (R. at 376–81, 434–35.)

Plaintiff saw Dr. Loomis again on August 6, 2010, and November 11, 2010. His physical examinations revealed normal results including normal gait and station. (R. at 386–89, 382–85.) In August, Dr. Loomis indicated that it was safe for Plaintiff to begin driving provided she had no more seizures or losses of consciousness. (R. at 386–89.) In November, Plaintiff presented with mild to moderate dizziness, intermittent vertigo produced by movement, and chronic insomnia. (R. at 382–85.) Dr. Loomis prescribed nortriptyline for Plaintiff's insomnia. (*Id*.)

### 3. Plaintiff's Back Pain

On July 19, 2010, Plaintiff's primary care physician, Dr. Theobald, wrote that Plaintiff reported mild thoracic pain that did not always respond to Celebrex and Tylenol. (R. at 354–55.) Upon examination, Plaintiff's back was mildly tender to palpitation in the mid thoracic spine. (*Id*.) Dr. Theobald ordered thoracic spine X-rays. (*Id*.) Those X-rays, done on July 19, 2010, revealed mild decreased height of the vertebral body of T6 suggesting a mild compression fracture of undetermined age as well as degenerative changes in the disks in the mid and lower spine. (R. at 1181.)

On September 3, 2010, Plaintiff reported ongoing pain in her back and pain at times in her buttocks that had not responded to conservative measures. (R. at 352–53.)  Dr. Theobald wrote that bone density testing on July 23, 2010, revealed evidence of osteopenia. (*Id*.) Upon examination, Plaintiff was tender on palpitation of the mid thoracic and lumbar spine. (*Id*.) Dr. Theobald prescribed Fosamax and ordered MRI studies. (*Id*.) An MRI of Plaintiff's thoracic

spine, done on September 10, 2010, showed mild to moderate scoliosis with associated arthritis but was otherwise unremarkable. (R. at 368–69.) There was no indication of a compression fracture. (*Id*.) An MRI of Plaintiff's lumbar spine appeared normal except for a Tarlov cyst at the level of S1 on the left. (*Id*.)

In October of 2010, Plaintiff treated with James R. Wolfe, M.D. at MedCentral PainCare Consultants.  (R. at 372–73, 371.) On October 7, 2010, Dr. Wolfe examined Plaintiff and found that she had extensive paraspinal tenderness mostly in the paraspinal muscles but perhaps in the facets with extension. (R. at 372–73.) He prescribed tramadol and low dose Robaxin. (*Id*.) On October 22, 2010, Dr. Wolf reviewed Plaintiff's MRIs and wrote that Plaintiff had some low-grade degenerative disc bulge and a little bit of facet arthritis. (R. at 371.) Upon examination, Plaintiff had extensive thoracic and lumbar paraspinal tenderness aggravated by range of motion especially extension. (*Id*.) Dr. Wolfe's clinical impression was thoracolumbar spondylosis/facet arthritis with mechanical back pain. (*Id*.) For treatment, Plaintiff was to try soaking, stretching, and home exercises. (*Id*.) Dr. Wolf continued to prescribe tramadol and Robaxin. (*Id*.)

4.      Plaintiff's Depression, Anxiety, and Memory Loss

The records reflect that Plaintiff sought treatment for depression, anxiety, and mood swings from her primary care physician, Dr. Theobaldt. (R. at 360–61, 422–23, 864–66, 350–51.) Dr. Theobald prescribed Plaintiff Prozac and Cymbalta. (*Id*.) At several office visits Plaintiff told Dr. Theobald that she had concerns about her short and long-term memory and that she believed she had memory issues since 2002 that had gotten dramatically worse after her sudden

hearing loss in January of 2010. (R. at 356–57, 350–51.) On January 14, 2011, Dr. Theobald referred Plaintiff for a neurological consultation. (R. at 422–23.)

Notes from OSU Neurology Center indicate that Plaintiff was examined by Meena S. Khan, M.D., on June 9, 2011. (R. at 427–31.) Plaintiff related that she had memory loss since a stroke in January of 2010 that caused hearing loss and balance issues and a seizure episode while sleeping. (*Id*.) Plaintiff also reported that her balance issues were better but that she smoked about two packs of cigarettes a day and drank up to four alcoholic drinks a day. (*Id*.) Upon physical examination Plaintiff had normal tone and bulk in all extremities, 5/5 strength throughout, although her upper left extremity slightly gave way initially but had full strength once re-tested, and she had slight postural and action tremors bilaterally. (*Id*.) Her station was within normal limits, and her gait was within normal limits although she had issues with tandem gait and she swayed but did not fall during rhomberg testing. (*Id*.) A cognitive examination revealed normal results for language (naming, reading, and repeating word) and comprehension (following 1-2-3 step commands). (*Id*.) With regard to memory, Plaintiff's semantic memory and procedural memory were normal. (*Id*.) She had, however, issues with episodic memory (she could not recall what she ate for breakfast) and working memory (she could not recall a 7-digit phone number given to her). (*Id*.) With regard to executive function, she scored 4 on a digit span forward test; named 8 animals in one minute; and could recite 8 months backwards in order although she skipped October. (*Id*.) She erred on a clock drawing test. (*Id*.) She was not oriented to date, day, and place without prompting. (*Id*.) Dr. Khan wrote that the testing revealed that Plaintiff had issues with memory and executive function. (*Id*.) Dr. Khan indicated that she would

9

order a reversible dementia work up, repeat an MRI, and review prior MRI results. (*Id.*) Dr.

Khan noted that a stroke of the inner ear should not produce Plaintiff's symptoms. (*Id.*) Dr. Khan

asked Plaintiff to reduce the amount of alcohol she drank and consider stopping smoking. (*Id.*)

### 5.    Plaintiff's Fibromyalgia

On June 14, 2011, Plaintiff began seeking treatment from rheumatologist Salem Foad,

M.D. (R. at 411–12.) Plaintiff presented with pain in the mid-back, neck, and scapula regions of

38 years duration; lower back pain of over 30 years duration; and pain and swelling in her

fingers on both hand of 15 years duration. (*Id.*)  Dr. Foad noted that Plaintiff smoked and drank

beer. (*Id.*) Upon examination, Dr. Foad found tenderness in Plaintiff's neck and suprascapular

areas, both side of her medial scapular border, her midthoracic spines at the T7-T8 level, both

sides of her costchondrial joints, and her lower back at L4-6. (*Id.*) Plaintiff's shoulders were not,

however, swollen or limited in rotation; her neck was not limited in rotation; and there was no

synovitis present in her fingers, wrists, elbows, knees, ankles, or MTP toe joints. (*Id.*) She had

flexion of the lumbar spine to 70 degrees and no hip pain or limitation with external or internal

rotation or flexion. (*Id.*) Dr. Foad wrote that X-rays of Plaintiff's cervical spine revealed only

mild degenerative changes but no narrowing of the disc spaces or bony spurring. (*Id.*) X-rays of

the thoracic spine showed mild degenerative changes but no compression collapse of vertebral

bodies. (*Id.*) X-rays of the lumbar spine showed mild calcification of the abdominal aorta and

mild degenerative changes but no significant narrowing of the hips or SI joints. (*Id.*) Results

from laboratory blood work were normal. (*Id.*) Dr. Foad's impression was fibromyalgia and mild

osteoarthritis of the spine. (*Id.*) His treatment plan included stretching exercises for Plaintiff's

neck and upper and lower back. (*Id*.) She was allowed to continue taking Celebrex, trazadone, and fluoxetine. (*Id*.)

 Plaintiff treated with Dr. Foad on July 11, 2011. (R. at 410.) She did not believe that the Celebrex was helping her pain. (*Id*.) Upon examination, there was tenderness in the scapular areas and medial scapular border but more so on the right side. (*Id*.) Plaintiff's right shoulder was tender and painful but not swollen or limited. (*Id*.) She was also tender in the right side of her lower back at L5 but she had flexion of the lower spine to 70 degrees. (*Id*.) Her right hip was painful but not limited in internal or external rotation or flexion. (*Id*.)  Plaintiff had no swelling in her knees or ankles, no rash, and no muscle weakness. (*Id*.) Dr. Foad diagnosed Plaintiff with fibromyalgia and osteoarthritis of the cervical and thoracic spine. (*Id*.) He assessed that Plaintiff's pain related mainly to fibromyalgia. (*Id*.) He wrote that her pain in her upper right was referred from trigger points in the scapular region and the right shoulder and that the pain in her right hip was referred from trigger points in her right side lower back. (*Id*.) His treatment plan was steroid injections in the right side lower back and Xylocaine. (*Id*.) He discontinued her Celebrex and prescribed meloxicam. (*Id*.)

 During an examination on September 27, 2011, Dr. Foad found that Plaintiff had tenderness in her right scapular area and medial scapular border. (R. at 409.) (*Id*.) Plaintiff's right shoulder was tender and painful but not swollen or limited, and her neck was not limited in rotation. (*Id*.) She also had no swelling in her fingers, wrists, or elbows, no rash, and no muscle weakness. (*Id*.) He treated her again with steroid injections and xylocaine in the right shoulder. (*Id*.) He prescribed Cymbalta. (*Id*.)

On November 29, 2011, Dr. Foad examined Plaintiff and found that she had slight tenderness in the lateral epicondyle area of her right elbow but no swelling or limitation. (R. at 408.)  She also had pain with movement in her right shoulder although it was not limited in internal or external rotation or abduction. (*Id*.) She also had pain anteriorly in her shoulder and in the trigger points in her right suprascapular area and medial scapular border. (*Id*.) Plaintiff had no synovitis or suffusion in either shoulder, her fingers, wrists, or flexor tendon. (*Id*.) X-rays of her right elbow showed no narrowing of the joint space, bony spurring, erosive changes, or calcific deposits. (*Id*.) X-rays of her right shoulder showed no narrowing of the joint space or calcific deposits. (*Id*.) Dr. Foad wrote that it was possible that the pain in Plaintiff's forearm related to tendonitis in her right elbow, or, alternatively, it could have been referred pain from the trigger points in the scapular area of her right shoulder. (*Id*.) He also wrote that she might have tendinitis in her right shoulder. (*Id*.) Dr. Foad replaced Plaintiff's meloxicam with diclofenac and additionally prescribed Robaxin. (*Id*.)

On February 28, 2012, Dr. Foad's examination revealed that Plaintiff had had tenderness in the lateral epicondyle of the right elbow but no synovitis, nodules or limited range of motion. (R. at 862.) She also had no synovitis in her fingers or wrists, no thenar atrophy, and no objective evidence of carpal tunnel syndrome. (*Id*.) Plaintiff had tenderness in her lower back at L4-L5 with more tenderness on her right side but she had flexion of the lumbar spine to 70 degrees. (*Id*.) Her hips and shoulders were not painful or limited and she had no rash, muscle weakness, or oral ulcers. (*Id*.) X-rays of the right elbow showed no narrowing of the joint space, erosive changes, or abnormal calcifications. (*Id*.) Dr. Foad assessed that Plaintiff's elbow pain was

related to tendinitis; that she might have right carpal tunnel syndrome; and that her back pain might be related to fibromyalgia and/or early osteoarthritis. (*Id.*) Plaintiff was given an injection in her right elbow and short-acting steroids. (*Id.*) She was also prescribed Vicodin, her Celebrex was increased. She was also told that she could continue taking trazodone and fluoxetine. (*Id.*)

On May 14, 2012, Dr. Foad wrote that Plaintiff was feeling better and that the number of bad days was decreasing. (R. at 860.) Upon examination, a Tinel and Phalen test were negative. (*Id.*) Plaintiff had no thenar atrophy and no synovitis in her fingers and wrists. (*Id.*) She did have tenderness in her right elbow but no synovitis or nodules in her elbow joint and her range of motion was not limited. (*Id.*) Plaintiff's shoulders and hips were not painful or limited in flexion, abduction, or internal or external rotation. (*Id.*) She had no swelling in her knees or ankles. (*Id.*) She did have tenderness and pain in her low back at the L5, but she had flexion of the lumbar spine to 70 degrees, negative straight leg test, and no weakness in her legs, and no rash, oral ulcers, or muscle weakness. (*Id.*) Dr. Foad assessed that Plaintiff might have carpal tunnel syndrome and that her elbow pain might be related to tendinitis. (*Id.*)

On September 10, 2012, Dr. Foad examined Plaintiff and wrote that she had tenderness in the trigger points in the lower back at L4-L5 and flexion of the lumbar spine to 50 degrees associated with pain. (R. at 859.) Her hips were painful but not limited in flexion, or internal or external rotation, and her straight leg raising was negative. (*Id.*) She had no synovitis or effusion in her knees or ankles and no synovitis in her fingers, wrists, or elbows. (*Id.*) Her shoulders and neck were painful but not limited. (*Id.*) She had tenderness and trigger points in the scapular areas on both sides. (*Id.*) She had no rash, oral ulcers, or muscle weakness. (*Id.*) Dr. Foad

13

assessed that Plaintiff's pain was related to fibromyalgia. (*Id.*) He prescribed her Neurontin

instead of Cymbalta and renewed her prescriptions for Celebrex, trazadone, fluoxetine, and

Vicodin. (*Id.*) Plaintiff also received steroid injections and Xylocaine in trigger points on both

sides of her lower back. (*Id.*)

On December 4, 2012, Dr. Foad wrote that he examined Plaintiff and found that she had

tenderness in the trigger points in the scapular areas of both her shoulders, and that her neck and

shoulders were painful although they were not limited. (R. at 858.) Plaintiff also had tenderness

in the trigger points in her lower back at L4-L5 and flexion of the lumbar spine to 50 degrees.

(*Id.*) Her hips were painful although they were not limited in flexion, abduction, or rotation. (*Id.*)

Her straight leg raising was negative. (*Id.*) X-rays of the cervical spine showed no narrowing of

the disc spaces or spurring. (*Id.*) X-rays of the lumbar spine showed no abnormality in the hips,

SI joints, lumbar vertebrae, or disc spaces. (*Id.*) He noted calcification of the abdominal aorta.

(*Id.*) Dr. Foad wrote that Plaintiff's pain related to fibromyalgia and he prescribed Celebrex,

trazadone, Robaxin, fluoxetine, and Vicodin. (*Id.*)

On February 25, 2013, Dr. Foad wrote that Plaintiff reported shoulder pain that started

about four weeks prior to her office visit and that she had fallen approximately two months prior

to her visit although her shoulder did not hurt immediately after that fall. (R. at 857.) Upon

examination, Plaintiff's shoulder was painful, tender, and limited in abduction and rotation

although she had no synovitis or effusion. (*Id.*) Plaintiff had tenderness in trigger points in the

scapular areas, more so on the right side, but her neck was not painful or limited. (*Id.*) Plaintiff

also had tenderness and pain in the lower back at L4-L5 and flexion of the lumbar spine to 50

14

degrees. (*Id.*) Her straight leg raising was negative. (*Id.*) Although she had a slight bony swelling

in the CM joint of her thumb and PIP joints, she had no synovitis in her fingers or wrists. (*Id.*)

Plaintiff's hips were not painful or limited in flexion or rotation, and she had no swelling in her

knees or ankles, and no weakness or rash. (*Id.*) X-Rays of the right shoulder showed no

narrowing of the joint space, bony spurring, or abnormal calcification. (*Id.*) Dr. Foad wrote that

Plaintiff's pain related to tendinitis and fibromyalgia. (*Id.*) Her shoulder was injected with

steroids and Xylocaine. (*Id.*)

      **B.**     **Medical Opinions: Plaintiff's Physical Functional Limitations**

          1.     State Agency Reviewing Doctors (Drs. Albert and Holbrook)

      On August 21, 2010, state agency reviewer Nick Albert, M.D., reviewed Plaintiff's file

and opined that she had no exertional limitations.  (R. at 66.)  Dr. Albert also opined that Plaintiff

could frequently climb ramps/stairs, stoop, kneel, crouch and crawl; occasionally balance; and

never climb ladders/ropes/scaffolds.  (*Id.*) Dr. Albert opined that Plaintiff had a communicative

limitation because of her limited hearing in her left ear.  (*Id.*)  That hearing disorder, which was

not at a listing level, would limit her to no work with loud noises, unprotected heights or hazards,

including with industrial machinery and commercial driving.  (*Id.*)  He also opined that Plaintiff

should avoid concentrated exposure to noise or vibration and all exposure to hazards (machinery,

heights, etc.)  (R. at 67.) On January 22, 2011, state agency reviewer Walter Holbrook, M.D.,

reviewed Plaintiff's file upon reconsideration.  Dr. Holbrook affirmed Dr. Albert's opinions with

additional limitations in that Plaintiff could perform a range of medium work, including

occasionally lifting 50 pounds, frequently lifting 25 pounds, standing and/or walking about 6

hours in 8-hour work day, and sitting about 6 hours in an 8-hour work day.  (R. at 78–80.)

> 2.      Plaintiff's Treating Physician, Dr. Theobald

On March 29, 2012, Dr. Theobald completed a physical capacity evaluation. In it, he

opined that Plaintiff could only stand for two to three hours, walk for two hours, and sit for two

to three hours during an eight-hour workday. (R. at 439.) Dr. Theobald further opined that

Plaintiff could only lift 10 pounds occasionally and that she could not use her hands for repetitive

pushing and pulling. (*Id.*) Dr. Theobald opined that Plaintiff could occasionally climb steps but

never bend, squat, crawl, or climb ladders. (R. at 440.) Plaintiff could reach above shoulder level

but could not do so repetitively. (*Id.*) Dr. Theobald answered "yes" when asked if Plaintiff's

condition was likely to deteriorate if she was placed under stress and if Plaintiff was likely to

have partial or full-day unscheduled absences from work occurring five or more days per month

due to her diagnosed conditions, pain and/or side effects of her medication. (*Id.*) Dr. Theobald

wrote that Plaintiff had vertigo and presumed infarction of her left ear and that this had caused

fall risks and issues with vertigo. (*Id.*) Dr. Theobald also wrote that Plaintiff had chronic back

pain which had been evaluated by pain specialists. (*Id.*) Dr. Theobald noted that she had also

treated Plaintiff for depression and anxiety. (*Id.*) Dr. Theobald indicated that Plaintiff had a

seizure of unclear etiology that had been witnessed by her husband and that Plaintiff had been

seen by neurology at OSU Medical Center and recommended reference to their notes for

specifics. (*Id.*)

**C.     Medical Opinions: Plaintiff's Mental Functional Limitations**

1.     State Agency Consultative Examiner Dr. Johnson

On August, 11, 2010, Plaintiff was evaluated by state agency consultative psychologist, K. Roger Johnson, M.D. (R. 345–49.) Dr. Johnson assessed an Adjustment Disorder and assigned Plaintiff a Global Assessment of Functioning score of 75.  (*Id.*) Dr. Johnson opined that Plaintiff's ability to relate to others including coworkers and supervisors was not impaired and that she could relate to co-workers and supervisors for simple, repetitive tasks and for some complicated or detailed verbal instructions and procedures. (R. at 349.) Dr. Johnson also opined that Plaintiff's ability to understand, remember, and follow instructions was not impaired. (*Id.*) Dr. Johnson noted that Plaintiff's delayed memory was weak but not impaired and that she was capable of completing routine activities of daily living at home and in the community. (*Id.*) Dr. Johnson wrote that Plaintiff was mentally capable to understand, remember and follow instructions. (*Id.*) Dr. Johnson opined that Plaintiff's ability to maintain attention, concentration, persistence and pace to perform simple, repetitive tasks was weak but not impaired.  (*Id.*)  Dr. Johnson opined that Plaintiff's ability to withstand stress and pressure associated with day-to-day work activity was mildly impaired in that she exhibited some limitations in the form of work inhibition and physical complaints. (*Id.*)

2.     State Agency Reviewers (Drs. Umana and Deitz)

On August 21, 2010, state agency reviewer Roseann Umana, Ph.D. reviewed Plaintiff's file and opined that it did not contain evidence of a severe psychological impairment noting that Plaintiff's activities of daily living were not impaired and that her performance on memory tests

was largely within normal limits.  (R. at 64.)  Dr. Umana further opined that Plaintiff had mild

impairments with regard to difficulties maintaining concentration, persistence, or pace.  (*Id*.)  On

January 7, 2011, state agency reviewer David Deitz, Ph.D. reviewed Plaintiff's file upon

reconsideration and affirmed Dr. Umana's assessment.  (R. at 77.)

3.    Plaintiff's Treating Physician, Dr. Theobald

On March 29, 2012, Dr. Theobald completed a mental residual functional capacity

questionnaire.  Dr. Theobald opined that Plaintiff was mildly impaired in her ability to work in

coordination with or in proximity to others without distracting them or exhibiting behavioral

extremes; to relate to the general public and maintain socially appropriate behavior; and maintain

personal appearance and hygiene. (R. at 441–42.) Dr. Theobald further opined that Plaintiff was

moderately impaired with regard to the following: her ability to accept instructions from

supervisors; respond appropriately to coworkers or peers; perform and complete tasks in a

normal work day or week at a consistent pace; work in cooperation with or proximity to others

without being distracted by them; process subjective information accurately and exercise

judgment; carry through instructions and complete tasks independently; maintain attention and

concentration for more than brief periods; perform at production levels expected by most

employers; respond appropriately to changes in a work setting; be aware of normal hazards and

take necessary precautions; behave predictably, reliably, and in an emotionally stable manner;

and to tolerate customary work pressures. (*Id*.) Dr. Theobald opined that Plaintiff was

moderately to markedly impaired with regard to her ability to remember locations, workday

procedures and instructions. (R. at 442.) Dr. Theobald also noted that Plaintiff's condition was

likely to deteriorate if she was placed under the stress of a job and noted that she had a history of anxiety, and that stress could cause her symptoms to worsen. (R. at 443.)

### D.    Plaintiff's Testimony

Plaintiff, represented by counsel, testified at the August 9, 2016, administrative hearing. (R. at 495–532.) Plaintiff indicated that her problems began after she had a stroke in the beginning of 2010 that had impacted her balance and hearing in both ears although she had since regained hearing in her right ear. (R. at 509.) Plaintiff also indicated that she began experiencing short and long-term memory problems immediately after her stroke. (R. at 510.) She had severe headaches and constant ringing in her ears. (R. at 514.) She could use a telephone on speaker, but people would get frustrated when she had to ask them to repeat things. (*Id.*)

After her stroke, Plaintiff's concentration and focused changed and she found performing her job duties at Wal-Mart difficult because she was required to know how to do several procedures just to complete one process. (R. at 516–17.) Plaintiff had difficulties completing tasks at home and simple tasks might take all day to complete. (R. at 517.) She cooked using a timer or writing a note on a whiteboard on her refrigerator and mainly made food that she could "heat and eat," like sandwiches or cereal. (R. at 518.) Relatives and friends checked on her regularly and helped her cook. (R. at 502, 518.) She could not read for pleasure because she would experience headache and have trouble remembering what she read. (R. at 519.) She had difficulties cleaning her house. (R. at 520.)

After her stroke, Plaintiff's balance problems prevented her from walking anywhere without holding onto something. (R. at 513–14.) After therapy, she now walked with a much

"wider stance to offset feeling out of balance." (R at 514.) Plaintiff testified that she walked "sometimes with a cane depending on the day and how my balance is doing that day." (*Id.*) In approximately 2013, Plaintiff felt she could walk the two blocks to her neighbor's house. (R. at 514–15.) However, someone assisted her, she used a cane, and she normally sat down and rested. (R. at 521–22.) At the time of the hearing, she could only walk on flat, level ground. (R. at 523.) The most she could walk is one block and only if she did so slowly and cautiously. (*Id.*)

Plaintiff also testified that since 2000, she had suffered back problems including scoliosis, lordosis, and spina bifida that had gotten progressively worse. (R. at 511.) She stated that she could only walk for short periods of time without having to rest and could not lay or sit or stay in any position for very long without having to move. (*Id.*) Her back hurt when she had to walk while working at Walmart but that her back had been worse since her stroke because she could no longer push through the pain. (R. at 511–12.) Plaintiff attended the hearing in a wheelchair noting she was recovering from double foot surgery. (R. at 512.) She noted that she could not walk from the parking lot to the hearing room without having to stop and sit. (R. at 512–13.) Plaintiff testified that she had been using a wheelchair for approximately three to four years when she would go grocery shopping or to places like the zoo with her grandchildren. (R. 513.) The wheelchair was not prescribed by a physician. (*Id.*)

When asked about her depression and anxiety, Plaintiff testified that she would become depressed after having discussions with people who told her about events that she could not remember. (R. at 512.) She had taken medication for her depression two years prior to the

hearing but stopped after she could no longer afford the copays and had looked into homeopathic ways to treat it. (R. at 515.) Her medication had been effective sometimes. (R. at 516.)

## III.    SUMMARY OF THE ADMINISTRATIVE DECISION

On September 21, 2016, the ALJ issued his decision. (R. at 461–87.) The ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on March 31, 2013. (R. at 465.) At Step One[2] of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantially gainful employment during the period from her alleged onset date of January 15, 2010, through her date last insured of March 31, 2013. (*Id.*) At Step Two, the ALJ found that through the date last insured, Plaintiff had the severe impairments of degenerative changes of the cervical, lumbar, and thoracic spine, right elbow epicondylitis and rotator cuff tear, left sensorineural hearing loss, status post left vestibular artery vascular event and T6

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);

compression fracture, and affective and anxiety disorders. (*Id.*) He further found at Step Three

that through the date last insured, Plaintiff did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments described in 20 C.F.R.

Part 404, Subpart P, Appendix 1. (R. at 465.)

Before proceeding to Step Four, the ALJ set forth Plaintiff's residual functional capacity

("RFC") as follows:

> After careful consideration of the entire record, the [ALJ] find[s] that from
> the alleged onset date of disability through the date last insured, the
> claimant has the residual functional capacity to perform light . . . work as
> defined in 20 CFR 404.1567(b). Climbing ramps and stairs, crawling,
> crouching, kneeling, and stooping are each limited to no more than
> frequently. Balancing and overhead reaching with the right upper
> extremity are each limited to no more than occasionally. She cannot climb
> ladders, ropes, and scaffolds, engage in commercial driving, and must
> avoid all exposure to workplace hazards such as unprotected heights and
> machinery. She is limited to work in environments no louder than a typical
> office environment. Mentally, the claimant retains the capacity to perform
> simple repetitive routine tasks involving only simple work-related
> decision, with few if any workplace changes.

(R. at 474.)  When devising this RFC, the ALJ accorded "no weight" to Dr. Theobald's opinions

about Plaintiff's physical functional limitations and restrictions because they were inconsistent

with the totality of the record evidence. (R. at 480.) The ALJ accorded "significant" weight to

the opinions of the State Agency reviewing physicians' opinions about Plaintiff's physical

limitations and restrictions because they were consistent with the totality of the evidence. (R. at

478–79.) The ALJ also stated that evidence submitted after the State Agency physicians

performed their review did not provide any credible or objectively new and material information

---

*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

that would "alter these findings concerning [Plaintiff's] functional limitations and restrictions." (R. at 479.) The ALJ also assigned partial weight overall to Dr. Theobald's opinions about Plaintiff's mental limitations and restrictions because some of the limitations that she opined were supported by the record while others were not. (R. at 483.) The ALJ also accorded partial weight to the opinions from the state psychological consultative examiner, Dr. Johnson, and the State Agency reviewers, Dr. Umana and Dr. Deitz, regarding Plaintiff's mental limitations because they were generally consistent with the totality of the evidence although the evidence could demonstrate that Plaintiff was less limited than they had opined. (R. at 482–83.)

At Step Four, the ALJ relied upon testimony provided by a Vocational Expert ("VE") at the hearing to find that Plaintiff's limitations preclude her ability to do past relevant work. (R. at 525.) At Step Five, the ALJ relied again on the VE's testimony and concluded that through the date last insured, Plaintiff could perform other jobs that existed in significant numbers in the national economy such as an office helper, mail sorter or sales assistant.  (R. at 527–28, 485–87.) Thus, he concluded that Plaintiff was not disabled under the Social Security Act. (R. at 487.)

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v.

Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th

Cir. 2007)).

## V.  ANALYSIS

Plaintiff alleges that the ALJ committed several reversible errors including that the ALJ

erred at Step Two when he analyzed Plaintiff's fibromyalgia and determined that it did not

constitute a medically determinable impairment.[3] The Court agrees and finds that the ALJ's

determination is not supported by substantial evidence.

---

[3] The Court notes that Plaintiff did not list fibromyalgia when she applied for benefits in
June of 2010. (R. at 107–08, 121.) Plaintiff, however, was not diagnosed with fibromyalgia until
2011. (R. at 411–12, 410.)

At Step Two, an ALJ must consider whether a claimant's impairment constitutes a "medically determinable impairment," *i.e.*, an impairment that results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1521, 404.1505, 404.1520(a)(4)(ii). Social Security Ruling ("SSR") 12-2p provides guidance on "how [the Commissioner will] develop evidence to establish that a person has a medically determinable impairment (MDI) of fibromyalgia (FM), and how [the Commissioner will] evaluate [fibromyalgia] in disability claims and continuing disability reviews under titles II and XVI of the Social Security Act (Act)." *Titles II & XVI: Evaluation of Fibromyalgia,* SSR 12-2p, 2012 WL 3104869, at *1 (S.S.A. July 25, 2012); *see also Herzog v. Comm'r. of Soc. Sec.*, No. 2:16-cv-244, 2017 WL 4296310, at *2 (S.D. Ohio Sept. 28, 2017). To establish a medically determinable impairment of fibromyalgia under SSR 12-2p, a claimant must have a positive diagnosis of fibromyalgia from an acceptable medical source and produce documented evidence that meets either: 1) the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia ("1990 ACR Criteria") or 2) the 2010 American College of Rheumatology Preliminary Diagnostic Criteria ("2010 ACR Criteria"). 2012 WL 3104869, at *2.

Under the 1990 ACR criteria, fibromyalgia may be found to constitute a medically determinable impairment if the claimant has documented evidence of the following three issues:

1. A history of widespread pain— that is pain in all quadrants of the body (the right and left sides of the body both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine or low back)— that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.

2. At least 11 positive tender points on physical examination . . . . The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist . . . .

3. Evidence that other disorders that could cause the symptoms were excluded . . . .

*Id*. at *2–*3. Under the 2010 ACR criteria, fibromyalgia may be found to constitute a medically determinable impairment if a claimant has documented evidence of the following three issues:

1. A history of widespread pain (as defined in the 1990 ACR criteria above).

2. Repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, irritable bowel syndrome, and  or signs, such as fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome . . .

3. Evidence that other disorders that could cause the symptoms were excluded . . . .

*Id*. at *3.

In this case, the ALJ appears to have concluded that Plaintiff's fibromyalgia did not constitute a medically determinable impairment under the 1990 ACR Criteria because the record did not reflect 11 positive tender points on physical examination. (R. at 467.) The ALJ also appears to have concluded that Plaintiff's fibromyalgia did not constitute a medically determinable impairment under either the 1990 ACR Criteria or the 2010 ACR Criteria because Plaintiff did not have a pain in all four quadrants of her body, and thus, did not have a history of wide-spread pain. (R. at 467.) The ALJ explained his Step Two analysis of Plaintiff's fibromyalgia as follows:

26

> The evidence also contains references to the possible diagnoses of fibromyalgia . . . The claimant's possible clinical diagnosis of fibromyalgia was carefully considered within the parameters of SSR 12-2p. However, there is no objective medical evidence establishing that the claimant's fibromyalgia is a medically determinable impairment within the meaning of SSR 12-2p, as the record does not reflect at least 11 positive tender points on physical examination or pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) persisting for at least three months. In light of the objective medical evidence, I find that the references to the possible diagnoses of fibromyalgia . . . do not constitute medically determinable impairments within the meaning of the Regulations from the alleged onset date of disability through the date last insured, and cannot be established as such based on the claimant's subjective complaints alone in this case.

(*Id.*) [4]

Plaintiff asserts that even if the ALJ concluded that Plaintiff's fibromyalgia did not constitute a medically determinable impairment under the 1990 ACR Criteria because the record did not reflect 11 positive tender points on physical examination, the ALJ erred when finding that Plaintiff's fibromyalgia did not constitute a medically determinable impairment under the 2010 ACR criteria. (*Pl's Statement of Errors*, ECF 8, at PAGE ID # 1387–88.) Specifically, Plaintiff contends that the ALJ erred when he found that the record did not demonstrate that Plaintiff had pain in all four quadrants of her body for at least three months.

The Court agrees. The records reflect that Plaintiff had pain in all four quadrants of her body that persisted for at least three months. On June 4, 2011, Dr. Foad physically examined Plaintiff and found that she had tenderness in her supra scapular areas on both sides of her medial scapular border and on both sides of her costchondral joints. (R. at 411–12.) On July 11,

---

[4] Although the ALJ stated that the record reflected a "possible" fibromyalgia diagnosis, the records reflect that Plaintiff's treating rheumatologist, Dr. Foad, routinely indicated that he had diagnosed Plaintiff with fibromyalgia. (R. at 410, 409, 408, 862, 860, 859, 858, 857.) Notably, the previous ALJ found that Plaintiff's fibromyalgia was a severe impairment.  (R. at

2011, Dr. Foad examined Plaintiff and again found that she had tenderness in her scapular areas and medial scapular border and that she additionally had tenderness and pain in her right shoulder and right hip. (R. at 410.) On September 27, 2011, Dr. Foad's examination revealed that Plaintiff had tenderness in her scapular areas and medial scapular border and that her right shoulder was tender and painful. (R. at 409.) On November 29, 2011, Dr. Foad wrote that upon examination, Plaintiff had slight tenderness in her right elbow; pain with movement in her right shoulder; pain anteriorly in her shoulder; and pain in trigger points in her right supra scapular area and medial scapular border. (R. at 408.) On September 10, 2012, Dr. Foad examination found that Plaintiff's hips and shoulders were painful and that she had tenderness and trigger points in both sides of her scapular area. (R. at 859.) On December 4, 2012, Dr. Foad wrote that his examination of Plaintiff revealed that she had tenderness in trigger points in the scapular areas of both shoulders and that her shoulders and hips were painful. (R. at 858.) In short, the records reflect examination results substantiating that Plaintiff had pain in all four quadrants of her body. The ALJ's contrary conclusion is not supported by substantial evidence.

The records also reflect that Plaintiff had axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) for at least three months. Physical examinations at office visit from 2010 until 2013 found that Plaintiff had tenderness or pain in her neck (R. at 411–12, 859, 858, 857); tenderness or pain in her thoracic spine (R. at 344–45, 352–53, 371, 411–12); and tenderness or pain in her lower back or lumbar spine (R. at 352–53, 862, 860, 859, 858, 857). Because the record reflects that Plaintiff had pain in all four quadrants of her body plus axial

16.)

skeletal pain, and that both persisted for at least three months, the records reflect that Plaintiff

had a history of wide-spread pain.

Defendant does not refute Plaintiff's assertion that the record reflects a history of wide-

spread pain. (*Mem. in Opp*., ECF No. 11, at PAGE ID # 1407–08.) Instead, Defendant correctly

asserts that the record does not reflect 11 tender points upon physical examination. (*Id*.) Even so,

that tender point requirement only pertains to the 1990 ACR criteria. It does not, however,

pertain to the 2010 ACR criteria.

Defendant also asserts that even if the ALJ erred when finding that Plaintiff's

fibromyalgia was not a medically determinable impairment, that error was harmless. (*Id*. at

PAGE ID # 1408.) Defendant reasons that because the ALJ determined that Plaintiff had other

severe impairments, he continued with the remaining steps in the disability determination, and

thus any error that he made at Step Two was legally irrelevant. Defendant's position, and the

cases cited in support, conflates the analysis of whether an impairment is medically determinable

with the analysis of whether a medically determinable impairment is severe. *See* 20 C.F.R. §

404.1521 ("After we determine that you have a medically determinable impairment(s) then we

determine if your impairment(s) is severe.") When a claimant has one or more medically

determinable impairments that are severe, an ALJ must consider the limiting effects of all the

claimant's medically determinable impairments, severe and not, when assessing a claimant's

RFC. 20 C.F.R. § 404.1545(e). Therefore, an ALJ's mischaracterization of an impairment as not

severe can be harmless in such circumstances because the disability determination continues and

the mischaracterized impairment is still included in the ALJ's RFC assessment. *See See Pompa*

*v. Comm'r of Soc. Sec.*, 73 Fed. App'x. 801, 803 (6th Cir. 2003) ("Because the ALJ found that

29

Pompa had a severe impairment at step two of the analysis, the question of whether

the ALJ characterized any other alleged impairment as severe or not severe is of little

consequence"); *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)

("Since the Secretary properly could consider claimant's cervical condition

in determining whether claimant retained sufficient residual functional capacity to allow him to

perform substantial gainful activity, the Secretary's failure to find that claimant's cervical

condition constituted a severe impairment could not constitute reversible error"). But an ALJ

does not consider impairments that are not medically determinable when assessing a claimant's

RFC. Thus, even though an ALJ's severity error may be harmless in the way that Defendant

describes, an error in an ALJ's medically determinable analysis is not, at least in this case, where

the ALJ did not indicate that he considered Plaintiff's fibromyalgia when he assessed her RFC at

Step Four.

        Indeed, at Step Four, the ALJ wrote that he "considered all symptoms" when he assessed

Plaintiff's RFC. (R. at 474.) Nevertheless, the pertinent regulations make it clear that certain

symptoms, including pain and fatigue, will not be found to affect a claimant's ability to work

unless medical signs or laboratory findings show the presence of a medically determinable

impairment that could reasonably expected to produce those symptoms. 20 C.F.R. § 404.1529.

Therefore, the Court cannot assume that the ALJ considered Plaintiff's fibromyalgia symptoms,

such as pain, in the absence of a finding that her fibromyalgia was a medically determinable

impairment. Accordingly, the Court reject's Defendant's contention that any error was harmless.

        Plaintiff also urges the Court to find that there is documented evidence that she can meet

the second requirement for the 2010 ACR Criteria, specifically repeated manifestations of six or

more fibromyalgia symptoms, signs, or co-occurring conditions. To be sure, the record contains evidence of depression (R. at 360–61, 422–23, 860), anxiety (R. at 422–23, 427–31, 864–66, 439, 433), memory issues (R. at 427–31, 349), insomnia (R. at 382–85, 360), waking from sleep unrefreshed (R. at 384), fatigue (R. at 360), and disturbed sleep (R. at 859). The Court, does not, however, decide whether Plaintiff can meet that second requirement or the third requirement of the 2010 ACR Criteria requiring elimination of other causes. Instead, the Court finds only that the reason that the ALJ gave for finding that Plaintiff could not meet that criteria— that the record did not reflect that Plaintiff had pain in all four quadrants of her body for at least three months— is not substantially supported by the record. Upon remand, the ALJ can consider if Plaintiff can satisfy those requirements.

Nor does the Court reach Plaintiff's other allegations of error. The Court's finding that the ALJ's Step Two analysis was flawed obviates the need to analyze and resolve Plaintiff's remaining contentions of error. Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignments of error if appropriate.

**VI.   CONCLUSION**

For all the foregoing reasons, the Court **REVERSES** the Commissioner's decision and **REMANDS** this case for further consideration under Sentence Four of § 405(g).  The Clerk is **DIRECTED** to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

Date:  May 27, 2020                    **/s/ Sarah D. Morrison_____**
                                       **SARAH D. MORRISON**
                                       **UNITED STATES DISTRICT JUDGE**

31